Spear, J.
The claims of Adolf Hartdegen and Mary S. Russell rest upon the same facts, and may be considered together. Whether or not these parties have a standing in court on their cross-petitions, depends upon the legal effect of a paper purporting to be an assignment, dated November 22,1887, signed by Charles A. Kebler, of which the following is a copy:
“Cincinnati, November %% 1887.
“In consideration of $9,000.00 owed by me to Henrietta D. Leonard, I sell, assign and transfer to Henrietta D. Leonard, all my household furniture, useful and ornamental, books, silverware, pictures, linen, carpets and everything contained in my house on the Reading road, including jewelry and everything else; also, my two horses, one at pasture, one in my stable, carriage, buggy, wagon, harness, cows and everything contained in said stable, except the pony and appurtenances, which belong to my son John. Also a certain promissory note made by W. S. Rix or his wife to my order, for about $200; also a certain note to my order for $500.00 made by C. A. G. Adáe. (The mortgage of John M. Strobel for $2,500.00, on which $1,000 has been paid, belongs to her, Kuhn has it). Also all my right and interest in and to The Cincinnati, Georgetown and Portsmouth Railroad Company. Twenty-five bonds of said road owned by me and my interest in its stock after the debts for which they (the bonds) are pledged are paid.
“I also sell, assign and transfer to the said Henrietta D. Leonard, any other collateral owned by me and not needed by S. Kuhn & Sons, to pay the $5,000-note, for which twelve bonds of the said road and certain mortgage notes are held as collateral. I also sell, assign and transfer, all for said first named consideration, all my office furniture, law books, safe, and all other articles owned by me at or pertaining to my law office, No. 5 West Fourth street, Cincinnati, Ohio, to said Henrietta D. Leonard; also a certain note and mort *452 gage made by T. Lewis Brown to my order for $4,138.10, now held by S. Kuhn & Sons as collateral for two of my notes for $500 each.
“After the above debt of $9,000 has been satisfied, I sell, assign and transfer to Adolf Hartdegen anything or everything above transferred, or the proceeds of the same, in consideration of $3,800 I owe him, and until said proceeds havé paid $3,800.
“After said H. D. Leonard and Adolf Hartdegen have been paid in full, I sell, assign and transfer to Mary S. Russell any and-all articles or proceeds left until my indebtedness to her is paid.
“Witness my hand and seal this November 23d, 1887.
“(Signed:) Charles A. Kebler, [seal].”
The findings of the circuit court show that prior to the execution of this paper, Mrs. Henrietta D. Leonard had entrusted Kebler, as her attorney and agent, with money to' invest for her, and that at the time of signing the paper, he had of her money for this purpose, about $9,000. He was insolvent, and at the time contemplated suicide. The instrument was not executed in pursuance of any arrangement with the assignees named, or either of them, and was without the knowledge of either of them. The paper was, before five o’clock of the morning of November 23, 1887, by Kebler inclosed in an envelope, addressed by him to Mrs. Leonard, then a relative and member of his family, and, in another envelope addressed to her was a letter of farewell, the two envelopes being surrounded by a rubber band. After the execution of the papers Kebler had several opportunities for delivering them to Mrs. Leonard, but did not do so, nor did he speak to her about them. About 8:30 o’clock A. M. Kebler took prussic acid, from the effects of which, about one ‘in the afternoon, he died. Before his death, but while he was under the influence of the drug, and almost unconscious, being about nine o’clock A. M., Mrs. Leonard entered his room, and found the papers mentioned lying by his side on the bed, and took them into her possession, and read them while he was still alive, but he had no knowledge of it then, nor afterwards, and never *453 gave actual consent thereto. The instrument was intended by Kebler for Mrs. Leonard, for her benefit and that of Adolf Hartdegen, and Mary S. Russell, in order to replace or make good to them the-amount owing to each, but he did not intend that Mrs. Leonard should receive the same until after his death.
Under these facts the circuit court held (3 O. C. C. P-,' 600), “That such paper was never, either actually or constructively, delivered by Kebler to the assignees named therein, or to either of them, and that he did not intend to deliver it during his life—that he did not part with the dominion thereof while he was conscious, and that the assignees took no title to such dioses in action by virtue of such instrument.”
We affirm this holding. “Delivery is the final step necessary to perfect the existence of any written contract.” 1 Daniel on Neg. Inst., sec. 63; 3 Washburn on Real Prop. (4th Ed.) 282; Phipps v. Hope, Adm'r, 16 Ohio St. 586; Williams v. Schatz, 42 Ohio St. 47; Gano v. Fisk, 43 Ohio St. 462; Flanders v. Blandy, 45 Ohio St. 108. And the rule is not changed by reason of the fact that the instrument is based upon a consideration. Canfield v. Ives, 18 Pick. 253; Mills v. Gore, 20 Pick. 28; Younge v. Guilbeau, 3 Wall. 636; Leigh v. Horseme, 4 Mayne. 28; Chamberlain v. Hopps, 8 Vt. 94; Elmore v. Marks, 39 Vt. 538; Boyd v. Slayback, 63 Cal. 493; Pulse v. Miller, 81 Ind. 192.
As to the claim of defendant Roelker, the finding shows, among other things that he and Kebler had been partners in the practice of law at Cincinnati. On and prior to June 23,1887, Kebler had become indebted to Roelker, for money loaned, about $13,000, and as collateral security for $3,000 of it, ten of the railroad bonds described in the cross-petition had been pledged, and were in Roelker’s possession. Part of this money was loaned to enable Kebler to repay money which, as he told Roelker at the time, he had received from third persons for the firm for investment, and had converted to his own use. In September, 1887, the partnership was dissolved. No settlement of the affairs *454 of the firm was made between the members, nor has any final settlement yet been made.
On the 23d day of June, 1887, Kebler executed and delivered to Roelker the assignment of railroad bonds (twenty-five in all) set up in his cross-petition; also the warranty deed of land therein described. Thirteen of the bonds were in the hands of Kuhn & Son, as collateral, and the remaining two in the hands of H. G. Roelker. The deed was filed for record in the recorder’s office of Hamilton county, November 23, 1887, at nine o’clock, a. m.
At the time of the delivery of the assignment and the deed, no statement had been made of, nor did Roelker know the exact state of, the partnership account, though he then knew that Kebler was indebted to him on firm account.
At the time of the delivery by Kebler to Roelker of the assignment and deed, as shown by the testimony of Roelker, who was the only witness as to what arrangement was made between them concerning the same, or as to what was said or done at the time of the delivery thereof, Kebler said, in relation thereto, no other person being present, that he (Kebler) was not able to make up the statement yet, and that the books of the firm had not been closed, but that he was indebted to me (Roelker) on the firm account; and he (Kebler) said also as follows, as stated by said Roelker:
“Whatever may be coming to you on a settlement of our affairs; I am going to get up this statement, and whatever is coming to you on settlement of the partnership affairs, I want to secure you against.
“I want to make you perfectly secure, and naturally you think that I have not done exactly what was right here, and I want to show you that I want you to feel absolutely secure and safe in every way, and I have drawn up this assignment. I want j^ou to hold that as security for the money you have advanced, and for whatever is coming to you, until we have a full settlement of our partnership affairs; on settlement of the partnership matters.”
*455 Roelker then took the deed and assignment and said “all right,” and this was all that was said by either.
The foregoing constitute the material facts relating to the transaction, as found by the court.
Then follows a finding respecting testimony given by Roelker on cross-examination. But these statements are in answer to questions, which are not given, nor does the finding purport to give all he said on cross-examination, upon the subject. We cannot, therefore, conclude that such answers as are given ought to have the effect of impairing the force either of the claim made by Roelker in his answer and cross-petition, or of Kebler’s language which the court finds was in fact used by him, and the question in dispute must be determined alone upon the findings of fact which appear in the record.
The court further found that subsequent to the death of Kebler, divers persons made demand, and have brought or threaten suit against Roelker, claiming to have had dealings with Kebler, acting and professing to act as the partner of Roelker, whereby, as is claimed by said parties, the said partnership, and said Roelker, became and are in debted to them and each of, them for moneys misappropriated by Kebler, in an amount aggregating more than the value of the security transferred to Roelker, as above stated. Roelker had no knowledge thereof until after the death of Kebler.
Thereupon the court found, as conclusion of law, that Roelker had, by reason of the assignment and deed, a lien on the bonds and on the real estate, for a sum aggregating $14,965.59, with interest, as and for moneys loaned, and for fees, etc., received by Kebler in excess of the amount due him, but that the conveyance and the assignment of said bonds, or either of them, were not executed and delivered to Roelker to secure or indemnify him, nor were they intended to secure or indemnify him against any loss or claim by reason of the misappropriation of moneys by Kebler acting and professing to act as the partner of Roelker; and that Roelker has no lien upon or right to hold said real estate and bonds as security, or indemnity for any *456 demand for which Roelker may have become liable as a member of the law firm of Kebler & Roelker, or of any firm of which the two were members, by reason of the misuse of the money, if any, of the clients of the firm by Kebler.
The question, therefore, upon this branch of the case is, whether the security held by Roelker should be limited only to the indebtedness found by the circuit court, or be extended to cover the liability of Roelker for the acts of Kebler with third persons, dealing with him as a member of the firm, as set up in the answer.
This court is not called upon to review the findings of fact, nor to review the evidence, nor to weigh it. The facts. are found, and we are concerned only with the proper legal conclusion which follows.
The assignment and deed gave to Roelker the legal title to the property transferred, from which followed the right of possession to the real estate, and to such of the bonds as were not actually delivered to him, by satisfying the prior lien of those who held them. What was said and done at the time of the delivery of the assignment and deed showed that those papers were to be regarded as mortgages and to be held as security. The evidence which established these facts also supplied the terms of the defeasance. These terms, as embraced in the findings, show that Kebler intended the property as security for whatever might be coming to Roelker upon a settlement of the partnership affairs, and that he was to hold the property as security until they should have a full settlement of partnership affairs. The mortgages partook, therefore, of the nature of indemnity, as well as security. The language contains no ambiguity, but is broad and plain, and it is not the duty of the court, as it seems to us, to search for extraneous facts for the purpose of belittling or impairing the effect of the security, which the words of the defeasance imply.
The allusion to a “statement” by Kebler, evidently had reference to a statement of the then condition of the partnership account with reference to fees, rents, etc., and did *457 not include the idea of misappropriation of funds of clients, and had Kebler stopped there, it would follow, as claimed by the administrator, that the security was intended to make good, (besides the borrowed money), only such obligations as might appear upon an adjustment of that account when made up. But Kebler went further. His language indicates that he was conscious he had done that which was wrong. This he had, before that time, confessed to Roelker, and he well understood that Roelker might feel uneasiness in regard to the risks incident to their partnership relation. As Kebler had done wrong as to one client, it might result that he had, or might, as to others, though Roelker had knowledge only of the one case, and apparently did not anticipate further negligence or misuse of funds. Each could not have failed to realize that liability would attach to Roelker for firm obligations, contracted by Kebler, and that, while one was solvent and responsible, the other was involved, and, in all probability, irresponsible. Then, too, Kebler’s language imports • appreciation of Roelker’s kindness to him, and gratitude for it, and it would be but natural that he would want to give, as Roelker, had he possessed knowledge of the exact facts, would want to receive, security and indemnity sufficient to cover not only liabilities actually then known, but any which might later be shown to exist. To ignore this feature of the 'transaction is to give no effect whatever to the words “naturally you think that I have not done exactly what was right here,” and “I want to show you that I want you to feel absolutely secure and safe in every way,” and “to hold that as security for whatever is coming to you, until we have a full settlement of our partnership affairs; on settlement of the partnership matters.” It would be impossible for Roelker to be “safe in every way,” unless he were protected from Kebler’s wrongful transactions as to the funds of clients of the firm, nor could the property prove a security for whatever should be coming to Roelker upon a settlement if the idea of indemnity for that risk were excluded. There is nothing to indicate that Roelker countenanced or encouraged the acts of Kebler, from which the liability, *458 now the subject of dispute, arose, and therefore it would be neither wrong nor immoral for him to be protected against Kebler’s short comings, of whatever character, which involved liability to him.
It seems evident, therefore, taking into account all that was said and done and understood, that the purpose of the security was to cause Roelker to feel secure and to make him secure in reality. Kebler did not undertake to limit the pledge to any special form of obligation, nor to such as might be then known to Roelker, nor indeed to such as then might be ascertainable. And we think the legal effect of the transaction is to embrace, within the securitjq whatever might, upon a settlement of all the partnership affairs, appear to be due from Kebler to Roelker. The extent of the right to resort to the pledge was to be ascertained when a settlement should be had; not before. Whatever appeared then to be due the property so pledged was to be subjected to pay.
No argument is needed to show that, if any of the claims made by those who charge that Kebler, as a member of the firm, had used their money, are sustained, Roelker will be liable, and Kebler’s estate obligated to re-imburse him, and that this obligation would be one arising out of the partnership matters; for, if the demand of such a creditor is in the nature of partnership business for the purpose of fixing liability on Roelker, it is equally a partnership matter for the purpose of a settlement of partnership affairs. No final settlement of partnership affairs can, therefore, be made, until these disputes are disposed of.
The claim of the administrator is that Roelker shall now give up his security, after satisfying the debt found by the circuit court, and the effect of it, if sustained, will be to compel Roelker to satisfy such demands of creditors as may be found against the firm, and deprive him of all security for reimbursement. This demand, we think, is unreasonable, and against the very letter, as well as the spirit, of the condition of defeasance. The question is made directly between the administrator and Roelker. The administrator can assert no title which Kebler could not, if living, and he *459 ought not to stand in any better position in this attempt to enforce such demand than would Kebler. And the proposition that Kebler could not be heard to' make such an unconscionable claim needs only to be stated to meet with universal acceptance.
We have no occasion to dispute the correctness, as a general proposition of the rule advanced by counsel for the administrator, that a covenant will be restricted in its application to that which was within the contemplation of the parties. But such principle cannot, we think, apply to a mortgage of property given to indemnify against loss to the extent of limiting it to such liabilities only as were known to the mortgagee where he does not stand equally, as to means of information, with the mortgagor, and when the language of the pledge is inconsistent with such limitation. Beyond this, the rule does not affect this case, because, as we think, it was fairly within the contemplation of the parties that Roelker should hold his security until a full settlement of all partnership affairs had been had, with the right then to subject the property to his indemnity from all liability arising from Kebler’s acts relating to partnership business, and, as matter of law, it is not of consequence, whether or not the particular acts were, at the time of the taking of security, known, or anticipated.

The judgment of the circuit court, as regards the contention of plaintiffs in error, will be affirmed. As to -that of Roelker it will be modified in accordance with this opinion.